**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re:<br><br>DONALD R. JOHNSON and LINDA A. JOHNSON,<br><br>Debtors. | Bankruptcy Case No. 20-15951 TBM<br>Chapter 7 |

**MEMORANDUM OPINION AND ORDER GRANTING MOTION TO CONVERT CASE FROM CHAPTER 7 TO CHAPTER 13**

## I.   Introduction.

Through the Bankruptcy Code,[1] Congress established two main types of consumer bankruptcy:  Chapter 7 and Chapter 13.  Chapter 7 is what most people think of when they hear the word "bankruptcy."  It is a type of liquidation.  In Chapter 7, the debtor turns over most non-exempt assets to a fiduciary — the Chapter 7 trustee — who then liquidates such assets and distributes the proceeds for the benefit of creditors.  Typically, after a fairly short time, the debtor receives a discharge of most of the debtor's debts and moves on.  Contrawise, Chapter 13 is a type of reorganization.  Chapter 13 "affords individuals receiving regular income an opportunity to obtain some relief from their debts while retaining their property."  *Bullard v. Blue Hills Bank*, 575 U.S. 496, 498 (2015).  The *quid pro quo* is the Chapter 13 plan.  A debtor must propose and obtain Court approval of a "plan under which [the debtor] pay[s] creditors out of . . . future income."  *Hamilton v. Lanning*, 560 U.S. 505, 508 (2010).  If the debtor makes "all payments under the plan," the debtor earns the right to a discharge and a "fresh start" free from most prior financial burdens.  The Chapter 13 bargain is tough.  Most Chapter 13 cases do not make it all the way to completion and discharge.

In this bankruptcy case, the Debtors, Donald R. Johnson and Linda A. Johnson (together, the "Debtors"), filed for protection under Chapter 7.  The first stages of the case went well.  The Debtors obtained their Chapter 7 discharge.  However, many months into the bankruptcy case, the Chapter 7 trustee, Simon E. Rodriguez (the "Chapter 7 Trustee") determined that he might be able to sell their home (for an amount in excess of the Debtors' mortgage, closing costs, and the Debtors' exemption) resulting in a potential return for creditors.  The Debtors did not want to lose their home.  So, they filed a "Motion to Convert" requesting authorization to switch from Chapter 7 liquidation

---

[1]     All references to the "Bankruptcy Code" are to the United States Bankruptcy Code, 11 U.S.C. §101 *et seq.*  Unless otherwise indicated, all references to "Section" are to sections of the Bankruptcy Code.

to Chapter 13 reorganization and thereby retain their home.  They relied on Section 706(a) which generally allows a debtor to "convert" a case from Chapter 7 to Chapter 13 "at any time."

This case presents a dispute over the Debtors' ability to convert from Chapter 7 to Chapter 13.  At first blush, Section 706(a) might seem to allow a bankruptcy debtor an "absolute right" to convert from Chapter 7 to Chapter 13.  However, a key Supreme Court decision, *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365 (2007), says otherwise.  Under *Marrama,* the Debtors must show that they are eligible (per Section 109(e)) to obtain relief under Chapter 13.  The Chapter 7 Trustee disputes the Debtors' eligibility.  And, he goes further.  Relying on *Marrama*, the Chapter 7 Trustee also contends that the Debtors' attempted switch to Chapter 13 constitutes "bad faith" which justifies denial of conversion.

Ultimately, the Court must decide whether the Debtors may convert from Chapter 7 to Chapter 13.  After analyzing the facts and law, the Court concludes that the Debtors are eligible to obtain relief under Chapter 13 and that their effort to convert does not constitute "bad faith."  As a result, the Debtors may convert to Chapter 13.  Of course, that does not end the story because the Debtors still have a long way to go.  They must propose and confirm a Chapter 13 plan to pay their creditors.  And, then they will need to complete their Chapter 13 plan.

## II.      Jurisdiction and Venue.

The Court has jurisdiction over the matter in dispute in this bankruptcy case pursuant to 28 U.S.C. § 1334.  The conversion issue is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) (matters concerning administration of the estate) and 157(b)(2)(O) (other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor relationship).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  No party has contested this Court's jurisdiction or venue.

## III.     Procedural Background.

The Debtors filed for bankruptcy protection under Chapter 7 on September 4, 2020.[2]  Simon E. Rodriguez was appointed as the Chapter 7 Trustee for the Debtors' bankruptcy estate.  A few months later, the Court entered an "Order of Discharge" discharging most of the Debtors' debts.[3]  Thereafter, the Chapter 7 Trustee determined that there might sufficient equity in the Debtors home (located at 12109 E. Arizona Drive, Aurora, Colorado (the "Property")) to fund distributions to creditors.  Accordingly, the Chapter 7 Trustee issued a "Notice of Possible Dividends."[4]  He also sought and

---

[2]      Docket No. 1.  Unless otherwise indicated, the Court will refer to particular documents contained in the CM/ECF docket for this Bankruptcy Case using the convention: "Docket No. ___."
[3]      Docket No. 32.
[4]      Docket No. 37.

obtained Court authorization to employ a real estate broker and to access the Property for possible sale.[5]  But, so far, the Chapter 7 Trustee has not sold the Property.

Instead, faced with the Chapter 7 Trustee's actions and possible sale of the Property, the Debtors elected to file their "Motion to Convert Case under Chapter 7 to Case under Chapter 13."[6]  As the title of the Motion to Convert suggests, the Debtors sought to convert their bankruptcy proceeding to Chapter 13 to retain the Property. Citing Section 706(a), the Debtors cursorily averred only:  "Debtor [sic] is eligible to be a debtor under Chapter 13 of the Code and desires to convert this case to a case under that chapter."[7]  Thereafter, the Chapter 7 Trustee submitted an "Objection" to the Motion to Convert.[8]  The Chapter 7 Trustee advanced three grounds for opposing conversion: (1) "the Debtors do not have an absolute right to convert"; (2) "the Debtors are proceeding in bad faith"; and (3) "the Debtors are not eligible for relief under Chapter 13."[9]  Based upon the contested Motion to Convert and Objection, the Court conducted a preliminary hearing during which "the parties agreed that an evidentiary hearing is required to resolve the issues . . . ."[10]  So, the Court set the dispute for trial on November 10, 2021.

About a week before the trial on the conversion dispute, the Debtors and the Chapter 7 Trustee jointly submitted their "Stipulated Facts for Hearing."[11]  The Stipulated Facts are unusually extensive and consist of 18 separate paragraphs with numerous additional subparts and two charts.  Contemporaneously with the filing of the Stipulated Facts, the Debtors and the Chapter 7 Trustee also jointly presented an "Agreed Motion to Convert Hearing on November 10, 2021 from an Evidentiary Hearing to Oral Argument on the Stipulated Facts."[12]  In the Motion to Vacate Trial, the Debtors and the Chapter 7 Trustee stated:

> The Debtors and the [Chapter 7] Trustee agree the Stipulated Facts eliminate the need for the scheduled evidentiary hearing.  Instead, the Debtors and the [Chapter 7] Trustee respectfully request the Court convert the hearing set for November 10, 2021 to an oral argument, applying the Stipulated Facts to the relevant law in this matter.[13]

Thus, both parties waived their right to an evidentiary hearing and instead asked the Court to rely factually only on the Stipulated Facts.  The Court concurred.[14]  Consistent with the foregoing, on November 10, 2021, the Court received oral argument from the

---

[5]     Docket Nos. 39, 41, 44, and 47.
[6]     Docket No. 49, the "Motion to Convert."
[7]     *Id.*
[8]     Docket No. 51, the "Objection."
[9]     *Id.*
[10]    Docket No. 55.
[11]    Docket No. 60, the "Stipulated Facts."
[12]    Docket No. 61, the "Motion to Vacate Trial."
[13]    *Id.*
[14]    Docket No. 62.

Debtors and the Chapter 7 Trustee based solely on the Stipulated Facts.[15]  Thereafter, the Court took the matter under advisement.  In the interim, the Court has reviewed all of the Stipulated Facts and evaluated the legal arguments.  The disputed issues are ripe for decision.

## IV.    **Factual Findings.**

At the request of the Debtors and the Chapter 7 Trustee, the Court relies on the Stipulated Facts for the factual record.  Accordingly, the Court makes the following findings of fact under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052 and 9014(c), which findings simply quote the Stipulated Facts:

1.    Donald R. Johnson and Linda A. Johnson filed their voluntary petition under Chapter 7 (the "Petition") on September 4, 2020 (the "Petition Date"). Debtors received their Chapter 7 discharge on December 14, 2020.

2.    The Debtors filed two (2) previous bankruptcy cases – a Chapter 13 case in 2001 under Case Number 01-22968-SBB, which case was ultimately converted to a Chapter 7; and a Chapter 13 case in 2006 under Case Number 06-12796-SBB.  The Debtors obtained discharges in both cases.

3.    Simon E. Rodriguez is the duly appointed and acting trustee in this case.

4.    Debtors moved to convert their case to a case under Chapter 13 of the Bankruptcy Code, to which the Trustee objected.  Debtors did not attach a proposed plan to the conversion motion, and, other than as described below, have not provided the Trustee with a proposed plan.

5.    In the Statement of Financial Affairs and Schedules filed with their petition, the Debtors scheduled an ownership interest in real property located at 12109 E. Arizona Drive, Aurora, CO 80012 (the "Property").  The Debtors listed the value of the Property as $400,000.00 and identified a $306,076.00 mortgage against the Property.

6.    For purposes of this Motion to Convert and the Objection thereto, the parties agree the value of the Property is $475,000.00.  As of September 7, 2021, the mortgage balance against the Property was $299,008.20.

7.    The Debtors were in COVID-19 related forbearance on their mortgage payments from April 7, 2020 through March 19, 2021.

8.    The Debtors were a month past due on the mortgage as of the September 7, 2021 statement.

---

[15]    Docket No. 64.

9.      The Debtors are entitled to a homestead exemption in the sum of $105,000.00.

10.     On June 10, 2021, the Trustee moved to employ Trelora Realty to list and sell the Property.  The Application was approved by Order of the Court entered June 28, 2021, without any objection from the Debtors.  In the Affidavit attached to the Trustee's Application, Trelora states it would accept a flat fee of $3,000.00 to list and sell the Property.  The buyer's commission is at the Trustee's discretion, but not more than 2.8%, and more likely 2.0%.

11.     The Debtors moved to convert the case in order to save the Property.

12.     On Debtors' Schedule I, they disclosed monthly net income in the sum of $5,073.14.  On Debtors' Schedule J, they disclosed monthly expenses of $5,070.26.  Based on Debtors' Schedules I and J, they had net disposable income of $2.88 on the Petition Date.  Debtors have not amended those schedules.

13.     Notwithstanding the Schedules, Debtors' income has changed since the Petition Date in the following ways:

a.      Mr. Johnson began receiving social security.  He received a lump sum payment of $27,874.00 on November 2, 2020; received monthly payments of $1,866.00 from November 2020 through June 2021; and currently receives monthly social security payments of $1,742.00 per month.

b.      Mr. Johnson's pension income decreased from $1,073.00 per month to $833.00 per month now.  Mr. Johnson also receives Veteran's Disability in the sum of $243.93 per month.

c.      Mrs. Johnson works as a nurse for Home Care RN, Inc. ("Home Care").  She started working at Home Care shortly before the Petition Date.  At Home Care, the Debtor provides in-home nursing care to patients, and is paid a flat rate per visit, which ranges between $20 and $90 per visit depending on the visit type.  On the Petition Date, and because the pandemic was in full swing, the Debtor's income was lower than usual.

d.      Since the Petition Date, Mrs. Johnson's income has increased because of an increased demand for her services with Home Care.  While Mrs. Johnson's income fluctuates, she states the $3,485.00 gross paycheck received on August 11, 2021 is a representative paycheck of her current regular pay for a two-week period.

14.     Since the Petition Date, the Debtors' expenses have changed in the following ways:

a.      When Mr. Johnson received his lump sum distribution from Social Security in the sum of $27,874.00 on November 2, 2020.  At the end of November 2, 2020, the Debtors had $25,253.36 in their US Bank Account ending 8219.  Two weeks later, the balance of the account was down to $13,472.77.  On September 16, 2021, at the end of the last statement available to the Trustee, the Debtors had just $1,909.44 in the account. The Debtors have less than $1,000.00 in all other accounts.  The Debtors spent $2,838.52 on auto repairs on November 9, 2020.  They applied the following payments toward their mortgage: $4,000.00 on November 5, 2021, $2,000.00 on November 18, 2020, and $2,000.00 on December 3, 2020.  They spent $2,000.00 to open a secured credit card on December 11, 2020.

b.      Over their last six (6) bank statements in the US Bank Account ending 8219, the Debtors have had the following deposits and withdrawals:

| Statement Period | Deposits | Withdrawals | Net Amount |
|---|---|---|---|
| 3/16/21-4/15/21 | $13,798.87 | $12,934.45 | $  864.42 |
| 4/16/21-5/17/21 | $10,331.25 | $10,957.84 | -$ 626.59 |
| 5/18/21-6/15/21 | $10,697.00 | $12,606.81 | -$1,909.81 |
| 6/16/21-7/16/21 | $11,959.95 | $11,310.80 | $  649.15 |
| 7/17/21-8/16/21 | $ 9,156.52 | $11,229.64 | -$2,073.12 |
| 8/17/21-9/16/21 | $11,776.23 | $10,546.86 | $1,229.37 |

c.      In addition to the expenses in the US Bank account ending 8219, the Debtors also have approximately $200 in expenses each month which come out of their Denver Community Credit Union Account ending 671.

d.      Post-petition and on December 4, 2020, the Debtors opened a secured credit card with US Bank.  The credit card was used for trips to: Las Vegas, Florida, Cripple Creek, Black Hawk, Waterworld, and to get their daughter back to Colorado from North Carolina.  A summary of the charges, payments and running balance on the credit card are as follows:

| Statement Period | Charges | Payments | Running Balance |
|---|---|---|---|
| 12/4/20-1/5/21 | $0 | $0 | $0 |
| 3/4/21-4/2/21 | $1,006.86 | $  806.86 | $   200.00 |
| 4/3/21-5/4/21 | $1,445.92 | $  692.97 | $  952.95 |
| 5/5/21-6/2/21 | $  932.77 | $1,152.95 | $  732.77 |
| 6/3/21-7/2/21 | $1,875.15 | $1,000.00 | $1,607.92 |

| 7/3/21-8/3/21 | $   581.71 (includes interest) | $   873.00 | $1,316.63 |
| 8/4/21-9/2/21 | $   778.20 (includes interest) | $1,100.00 | $   994.83 |
| 9/3/21-10/4/21 | $1,791.42 | $1,200.00 | $1,586.25 |

15.     During the last year, the Debtors have incurred additional debt of $1,586.25.

16.     The Debtors will have the following reductions in their expenses:

a.     After the Petition Date, the Debtors paid off their car loan with LendMark which is $338.00 per month.

b.     After the Petition Date, the Debtors' son took over the loan payment for a vehicle in the sum of $426.00 per month.  The Debtors' son, however, did not take over the loan itself.  The Debtors remain obligated on that debt.

17.     While the Debtors have not filed a proposed Chapter 13 Plan yet, they expect to propose payments of $450.00 per month to the Chapter 13 Trustee for a period of sixty (60) months.

18.     If the Property sells for $475,000.00, the following distributions will be made at closing:

a.     Buyers' commission of 2% which amount is equal to $9,500.00;

b.     Trelora's commission of $3,000.00;

c.     Estimated Closing Costs of $3,000.00;

d.     Mortgage of $306,000.00 (for purposes of this Motion to Convert and Objection thereto, the Trustee is giving the Debtors credit in this calculation for the principal balance on the Petition Date);

e.     Homestead Exemption of $105,000.00; [and thus]

f.     Total amount paid to the Estate: $48,500.00

## V.     <u>Legal Analysis.</u>

## A.     <u>General Legal Framework.</u>

In the Motion to Convert, the Debtors request conversion from Chapter 7 to Chapter 13 pursuant to Section 706 which provides, in relevant part:

(a)    The debtor may convert a case under this chapter [Chapter 7] to a case under chapter 11, 12, or 13 of this title at any time, if the case has not been converted under section 1112, 1208, or 1307 of this title.  Any waiver of the right to convert a case under this subsection is unenforceable.

. . . .

(d)    Notwithstanding any other provision of this section, a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter.

With respect to Section 706(a), it is common ground that the Debtors have not previously converted their bankruptcy case under Sections 1112, 1208, or 1307.  So, what remains of the statutory text as applied here is simply that the Debtors "may convert a case under [Chapter 7] to a case under [Chapter 13]."  Congress provided no express standard for such conversion in Section 706(a).

Until early 2007, many courts construed Section 706(a) as an "absolute" one-time right to convert from Chapter 7 to Chapter 13.  *See Calder v. Job (In re Calder)*, 973 F.2d 862, 867 (10th Cir. 1992) ("the Bankruptcy Rules cannot override the absolute statutory right to convert pursuant to § 706(a)."); *see also Martin v. Martin (In re Martin)*, 880 F.2d 857, 859 (5th Cir. 1989) ("Congress intended to encourage such conversions and to give the debtor an absolute one-time right to convert . . . ."); *Pequeno v. Schmidt (In re Pequeno)*, 126 Fed. Appx. 158, 163 (5th Cir. 2005) (unpublished) ("The statutory language makes it clear that the right to convert is absolute and unqualified."); *Miller v. U.S.Tr. (In re Miller)*, 303 B.R. 471, 473 (10th Cir. BAP 2003) ("The stated policy behind § 706(a) is to provide the debtor with 'the one-time absolute right of conversion ... [in order to give] the debtor ... the opportunity to repay his debts . . . .'").

However, the conversion landscape changed when the Supreme Court announced its seminal decision on the topic:  *Marrama*, 549 U.S. 365.  The *Marrama* case involved a Chapter 7 debtor who "made a number of statements about his principal asset, a house in Maine, that were misleading or inaccurate."  *Id.* at 368.  For example, the debtor claimed that his house had a value of "zero" whereas the property actually "had substantial value."  *Id.*  The debtor asserted that he had not made any non-ordinary course transfers of property in the year preceding his bankruptcy; but, in fact, the debtor transferred his house to a "newly created trust for no consideration" in order to "protect the property from his creditors."  *Id.*  The debtor also wrongfully claimed a homestead exemption in another property and lied about a tax refund related to such other property.  *Id.* at 369 n.3.  When the Chapter 7 trustee initiated efforts to recover the house for the bankruptcy estate, the debtor moved to convert his bankruptcy case to Chapter 13 relying on Section 706(a).  Notwithstanding the debtor's own false reporting

8

and concealment, he argued that "he had an absolute right to convert his case from Chapter 7 to Chapter 13 under the plain language of § 706(a) of the Code." *Id*. at 370.

In *Marrama,* the Supreme Court rejected the "absolutist" approach and found that the debtor "forfeited his right to proceed under Chapter 13." *Id*. at 371. The Supreme Court pointed out that Section 706(d) acts as a limit on conversion under Section 706(a) and requires that a debtor be eligible for Chapter 13 per the eligibility requirements of Section 109(e) and also not subject to immediate dismissal or conversion under Section 1307(c) "for cause" including "bad faith." *Id*. at 372-74. Regarding "bad faith" circumstances, the Supreme Court held:

> Nothing in the text of either § 706 or § 1307(c) . . . limits the authority of the court to take appropriate action [including denial of conversion from Chapter 7 to Chapter 13] in response to fraudulent conduct by the atypical litigant who has demonstrated that he is not entitled to the relief available to the typical debtor.

*Id*. at 374-75. The Supreme Court approved the denial of conversion for "bad faith" under the *Marrama* facts and also provided some helpful general guidance for trial courts regarding the parameters for "bad faith":

> We have no occasion here to articulate with precision what conduct qualifies as "bad faith" sufficient to permit a bankruptcy judge to dismiss a Chapter 13 case or to deny conversion from Chapter 7. It suffices to emphasize that the debtor's conduct must, in fact, be atypical. Limiting dismissal or denial of conversion to extraordinary cases is particularly appropriate in light of the fact that lack of good faith in proposing a Chapter 13 plan is an express statutory ground for denying plan confirmation.

*Id*. at 375 n.11.

Subsequent to *Marrama*, eligibility for conversion from Chapter 7 to Chapter 13 under Section 706(a) "is dependent on two things: first whether the debtor is eligible to be a debtor under chapter 13 under 11 U.S.C. § 109(e); and second, whether the case, if converted, would be dismissed under 11 U.S.C. § 1307(c) [for bad faith or otherwise]." *In re McDonald*, 508 B.R. 187, 204 (Bankr. D. Colo. 2014). *See also In re Norwood*, 2013 WL 4099834, at *7 (Bankr. D. Colo. Aug. 8, 2013) (same).

**B.      The Debtors Are Eligible to Be Chapter 13 Debtors Under Section 109(e).**

Section 109(e) establishes the basic eligibility requirements for Chapter 13 cases:

> Only an individual with regular income that owes, on the date
> of the filing of the petition, noncontingent, liquidated,
> unsecured debts of less than $419,275 and noncontingent,
> liquidated, secured debts of less than $1,257,850, or an
> individual with regular income and such individual's spouse,
> except a stockbroker or a commodity broker, that owe, on
> the date of the filing of the petition, noncontingent, liquidated,
> unsecured debts that aggregate less than $419,275 and
> noncontingent, liquidated, secured debts of less than
> $1,257,850 may be a debtor under chapter 13 of this title.

11 U.S.C. § 109(e).  Parsing the text, there are two main requirements: (1) the debtor must be an "individual with regular income"; and (2) the debtor's debts must not exceed certain debt limits.

### 1.     The Debtors Are Individuals With Regular Income.

The Court's first eligibility task is to assess whether the Debtors have shown that they are "individual[s] with regular income."  Clearly, the Debtors are "individuals" because they are natural persons, not corporate entities.  The phrase "individual with regular income" is further defined by Section 101(30) as meaning:

> . . . . individual whose income is sufficiently stable and
> regular to enable such individual to make payments under a
> plan under chapter 13 of this title.

11 U.S.C. § 101(30).

Factually, the Debtors established that when they filed for bankruptcy on September 4, 2020, they had combined monthly income of $5,073.14 and monthly expenses of $5,070.26.[16]  Thus, their income and expenses almost matched leaving only $2.88 in net disposable income.[17]  Although (for reasons unknown to the Court) the Debtors have not amended their Schedules I and J, the Stipulated Facts showed that their financial position has improved.[18]

---

[16]     Stip. Fact No. 12.

[17]     Stip. Fact No. 13.

[18]     Potentially, there is an open legal issue whether the Court should assess Chapter 13 eligibility as of the petition date or as of the date of possible conversion to Chapter 13.  Most courts seem to focus on the circumstances at conversion.  *In re Mercado*, 376 B.R. 340 (Bankr. M.D. Fla. 2007); *see also, Norwood*, 2013 WL 4099834, at *8 (considering "most recent Schedule I" income rather than limiting analysis to petition date but not discussing debate).  Many of the Stipulated Facts advanced by the Debtors and the Chapter 7 Trustee as relevant pertain to the Debtors' post-petition changes in income and expenses.  During closing argument, the Debtors and the Chapter 7 Trustee argued mostly about the Debtors' current income and expenses.  Neither party advocated for using only the petition date to assess eligibility in the context of conversion.  Under these circumstances, the Court accepts the parties' implicit position that Chapter 13 eligibility should be determined based upon facts as of the time of conversion.

Just months after the bankruptcy filing, Mr. Johnson (who is retired) began receiving monthly Social Security payments. Although the Social Security payments have varied a bit, they currently add up to an additional $1,742.00 each month.[19] Meanwhile, Mr. Johnson's pension income decreased from $1,073.00 to $833.00 per month.[20] And, he started to receive Veteran's Disability payments of $243.93 each month.[21] Thus, Mr. Johnson's currently monthly income is: $2,818.93 ($1,742.00 + $833.00 + 243.93 = $2,818.93). That amount is much higher than when Mr. Johnson filed for bankruptcy protection. Mrs. Johnson is a nurse who works in home care. Her income also has increased. When she filed for bankruptcy, "the pandemic was in full swing, [so her] income was lower than usual."[22] Currently, she makes about $6,970.00 gross per month.[23] Assuming $1,002.36 in payroll deductions (which is the amount on Mrs. Johnson's unamended Schedule I), her current monthly income is about $5,967.64. Thus, together, the Debtors have current monthly income of approximately $8,786.57 (as compared to just $5,073.14 when they filed for bankruptcy).

Unfortunately, the Court did not receive much specific updated information concerning the Debtors' expenses. As noted previously, when they filed for bankruptcy, the Debtors' monthly expenses were $5,070.26.[24] In the interim, they paid off an automobile loan "with LendMark which [was] $338.00."[25] So that is a net positive. And, their son "took over a loan payment for a vehicle in the sum of $426.00 per month.[26] However, since the Debtors "remain obligated on that debt," the Court does not deem it appropriate to eliminate that expense in the analysis. The Debtors have incurred additional debts since the bankruptcy on credit cards in the aggregate amount of $1,586.25.[27] Beyond that, there is no evidence that the Debtors' regular, recurring monthly expenses have changed.

Notwithstanding, the Chapter 7 Trustee points the Court to summaries of the Debtors' bank account activity apparently suggesting that the Debtors have spent too much (at least according to the Chapter 7 Trustee's subjective view) in the last year while the Debtors were in bankruptcy.[28] The Chapter 7 Trustee references money spent for trips to "Las Vegas, Florida, Cripple Creek, Black Hawk, Waterworld, and to get their daughter back to Colorado from North Carolina."[29] However, as debtors in Chapter 7, the Debtors were under no obligation to rein in their post-petition spending

---

[19]   Stip. Fact No. 13(a).
[20]   Stip. Fact No. 13(b). There seems to be a discrepancy in the Stipulated Facts because Mr. Johnson's Schedule I showed pension income of $1,200.50, not $1,073.00. However, at the parties' request, the Court accepts the Stipulated Facts as dispositive.
[21]   *Id*.
[22]   Stip. Fact No. 13(c).
[23]   Stip. Fact No. 13(d). Stip. Fact No. 13(d) identifies "$3,485.00 gross" as her income. However, at oral argument, the parties agreed that Mrs. Johnson is paid that amount twice a month.
[24]   Stip. Fact No. 12.
[25]   Stip. Fact No. 16(a).
[26]   Stip. Fact No. 16(b).
[27]   Stip. Fact Nos. 14(d) and 15.
[28]   Stip. Fact Nos. 14(a)-(c). The actual bank account statements were not introduced into evidence.
[29]   Stip. Fact No. 14(d).

(albeit that it might have been wise to do so).  And, just because they apparently took numerous trips in 2020 and 2021 (before they decided to try to convert to Chapter 13) does not mean that such expenses will regularly recur if the Debtors are able to convert to Chapter 13.  In any event, the Chapter 7 Trustee also asks the Court to consider cash flows through the Debtors' main bank account during six months in 2021.[30] According to the Stipulated Facts, the Debtors had just $1,909.44 in the bank account as of September 16, 2021.[31]  Based on a summary chart, the Debtors deposited between $9,156.52 and $13,798.87 per month into their main bank account while withdrawing between $10,546.86 to $12,934.45 per month.[32]  In three of such months, the Debtors withdrew more than they deposited.  And, in the other three months, they withdrew less than they deposited.  Which proves what exactly?  The Court does not know and has no specifics regarding the source and use of the funds in the bank account.

The Debtors bore the burden to show that they have "income [that] is sufficiently stable and regular to enable such individual to make payments under a plan under chapter 13 of this title."  11 U.S.C. § 101(30).  They met their burden.  The Debtors have current monthly income of about $8,786.57.  Mr. Johnson's income comes from monthly Social Security, pension, and Veteran's Disability payments.  Although he is retired and so is not a wage earner, his monthly Social Security, pension, and Veteran's Disability payments qualify as income for purposes of Chapter 13 eligibility under Section 109(e). *Bibb Cnty. Dep't of Fam. & Child. Servs. v. Hope (In re Hammonds)*, 729 F.2d 1391, 1393-95 (11th Cir. 1984) (welfare benefits qualify as income for Chapter 13 eligibility purposes); *Norwood,* 2013 WL 4099834, at *9 (Social Security benefits can be a source of regular income [under Section 109(e)]"); *In re Dawson,* 13 B.R. 107, 109 (Bankr. M.D. Ala. 1981) ("persons who receive pension, welfare, and various government-provided benefits qualify as individuals with regular income").  Mrs. Johnson's income comes from regular pay for employment.  On the expenses side, the best evidence the Court has about the Debtors' regular recurring expenses is that they total about $5,070.26 per month or maybe less (since the Debtors paid off an automobile loan).  The difference between such income and such expenses means that the Debtors are likely to be able to fund a Chapter 13 plan of at least $450.00 per month in payments to the Chapter 13 Trustee as they apparently intend.[33]  Thus, the Debtors pass the initial Section 109(e) Chapter 13 eligibility hurdle of being "individual[s] with regular income."

### 2.    The Debtors' Debts Do Not Exceed Chapter 13 Eligibility Limits.

The Court's second eligibility task is to assess debt limits.  Section 109(e) dictates that Chapter 13 can only be used by debtors whose aggregate (noncontingent and liquidated) unsecured debt is less than $419,275.00 and whose aggregate (noncontingent and liquidated) secured debt is less than $1,257,850.00.  The Debtors

---

[30]     Stip. Fact No. 14(b).
[31]     Stip. Fact No. 14(a).  Stip. Fact No. 14(a) contradicts Stip. Fact No. 14(b) which shows a different amount ($1,229.37) in the same bank account as of September 16, 2021.
[32]     Stip. Fact No. 14(b).
[33]     Stip. Fact No. 17.

satisfy both tallies.  According to the Debtors' Schedule E/F, their unsecured debt is $240,173.75 (including priority unsecured debt of $1,387.00 and non-priority unsecured debt of $238,786.75), which amount is about 57% of the Chapter 13 unsecured debt cap.  Meanwhile, the Debtors' Schedule D secured debt amounts to $329,822.00, which is about 26% of the Chapter 13 secured debt limit.  According to the Claims Register, the filed claims are actually far less than the foregoing.  So, anyway the issue is analyzed, the Debtors fall below the Chapter 13 debt limits.

### 3. The Debtors Are Eligible to File for Protection under Chapter 13.

The Debtors have shown that they are "individuals[s] with regular income" according to Section 101(30).  And, their unsecured and secured debts fall well below the Chapter 13 debt caps.  Accordingly, the Debtors are eligible to file for Chapter 13 under Section 109(e).

### C. The Conversion Motion Has Not Been Filed in Bad Faith.

Even if the Debtors are eligible for protection under Chapter 13, the Supreme Court's *Marrama* decision dictates that conversion from Chapter 7 to Chapter 13 may be denied if the Debtors are proceeding in "bad faith" such that any Chapter 13 case would be subject to immediate dismissal or conversion under Section 1307(c) "for cause" including "bad faith."  *Marrama,* 549 U.S. at 372-74.  The party opposing conversion (in this case, the Chapter 7 Trustee) bears the burden of proving "bad faith." *In re Love*, 957 F.2d 1350, 1355 (7th Cir. 1992) (party asserting lack of good faith under Section 1307(c) bears the burden of proof); *McDonald*, 508 B.R. at 205 (party contesting conversion from Chapter 7 to Chapter 13 on the basis of bad faith bears the burden); *Norwood,* 2013 WL 4099834, at *7 ("burden is placed on an objecting party to show that the debtor is attempting to convert the case in bad faith").

### 1. Conversion Legal Standard: Totality of the Circumstances Based on the *Gier* Factors.

Generally, "in determining whether a Chapter 13 petition has been filed in bad faith under Section 1307(c), the bankruptcy court must consider the 'totality of the circumstances.'"  *In re Gier*, 986 F.2d 1326, 1329 (10th Cir. 1993) (citing *Love*, 957 F.2d at 1354-55); *see also McDonald*, 508 B.R. at 204 ("The issue of seeking conversion in bad faith is a question of fact determined by the totality of the circumstances.").  The "totality of the circumstances" approach focuses on whether there has been an "abuse of the provisions, purposes, or spirit of [the Bankruptcy Code]."  *Gier,* 986 F.2d at 1328; *cf. Flygare v. Boulden*, 709 F.2d 1344, 1347 (10th Cir. 1983) ("[A] finding of good faith [under Section 1325(a)] requires an inquiry, on a case-by-case basis, into whether the plan abuses the provisions, purposes or spirit of Chapter 13.").  Binding appellate precedent from the United States Court of Appeals for the Tenth Circuit (the "Tenth Circuit") endorses the following as relevant factors to be considered in a Section 1307(c) bad faith inquiry:

> [1] the nature of the debt, including the question of whether
> the debt would be nondischargeable in a Chapter 7
> proceeding; [2] the timing of the petition; [3] how the debt
> arose; [4] the debtor's motives in filing the petition; [5] how
> the debtor's action's affected creditors; [6] the debtor's
> treatment of creditors both before and after the petition was
> filed; and [7] whether the debtor has been forthcoming with
> the bankruptcy court and the creditors.

*Gier*, 986 F.2d at 1329 (quoting *Love,* 957 F.2d at 1357).  Such factors routinely are applied by Bankruptcy Courts within the Tenth Circuit when considering contested motions to convert from Chapter 7 to Chapter 13 under *Marrama*.  *See Alexander v. Hardeman (In re Alexander)*, 363 B.R. 917, 925 (10th Cir. BAP 2007) (recognizing *Gier* factors as "the Tenth Circuit's most comprehensive discussion of bad faith vis a vis § 1307"); *McDonald*, 508 B.R. at 205 ("*Gier* remains good law for determining bad faith under § 1307(c) in this Circuit.").  While applying the totality of the circumstances standard using the *Gier* factors, the Court also recognizes that denial of conversion is appropriate only in "extraordinary cases."  *Marrama*, 549 U.S. at 375 n.11.

### 2.   The Court Need Not Consider the Other *Flygare* and *Cramner* Factors.

The Court will apply the "totality of the circumstances" standard utilizing the seven *Gier* factors.  The Court's application is tempered by the recognition that denial of conversion is appropriate only in extraordinary circumstances.  Nevertheless, a short detour into other factors is necessary because the Chapter 7 Trustee advocated that the Court also consider the so-called *Flygare* and *Cranmer* factors.

The Tenth Circuit has employed slightly different tests for considering bad faith (or the lack of good faith) at the various distinct stages of a Chapter 13 proceeding.  *See Norwood,* 2013 WL 4099834, at *11.  As set forth above, unequivocally, the *Gier* factors govern determinations of bad faith when a motion to dismiss or convert a case is brought under Section 1307(c).  However, the Tenth Circuit adopted a list of eleven factors (many similar and overlapping) to be considered during the confirmation process in evaluating whether a Chapter 13 "plan has been proposed in good faith" under Section 1325(a)(3).  *Flygare*, 709 F.2d 1344.  The *Flygare* factors are:

> (1) the amount of the proposed payments and the amount of
> the debtor's surplus; (2) the debtor's employment history,
> ability to earn and likelihood of future increases in income;
> (3) the probable or expected duration of the plan; (4) the
> accuracy of the plan's statements of the debts, expenses
> and percentage repayment of unsecured debt and whether
> any inaccuracies are an attempt to mislead the court; (5) the
> extent of preferential treatment between classes of creditors;

14

> (6) the extent to which secured claims are modified; (7) the type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7; (8) the existence of special circumstances such as inordinate medical expenses; (9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act; (10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and (11) the burden which the plan's administration would place upon the trustee.

*Id.* at 1347-48 (quoting *U.S. v. Estus (In re Estus)*, 695 F.2d 311, 317 (8th Cir. 1982)); *see also Mason v. Young (In re Young)*, 237 F.3d 1168, 1174-75 (10th Cir. 2001) (reconfirming *Flygare* factors for Section 1325(a) good faith evaluation); *Robinson v. Tenantry (In re Robinson)*, 987 F.2d 665, 668 (10th Cir. 1993) (same); *Pioneer Bank v. Rasmussen (In re Rasmussen)*, 888 F.2d 703, 703-04 (10th Cir. 1989) (same).  The *Flygare* list is "not exhaustive, and the weight given each factor will necessarily vary with the facts and circumstances of each case."  *Flygare*, 709 F.2d at 1348.

The *Flygare* decision pre-dates changes to the Bankruptcy Code — including to Sections 1325(b)(1) and (2) — made by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005) ("BAPCPA").  However, even post-BAPCPA, the Tenth Circuit confirmed the vitality of *Flygare*.  The key post-BAPCPA decision is *Anderson v. Cranmer (In re Cranmer)*, 697 F.3d 1314 (10th Cir. 2012), in which the appellate panel endorsed the *Flygare* factors and instructed:

> The good faith determination is made on a case-by-case basis considering the totality of the circumstances.  *Flygare v. Boulden*, 709 F.2d 1344, 1347 (10th Cir. 1983).  In evaluating a debtor's good faith, courts should consider eleven non-exclusive factors [from *Flygare]* as well as any other relevant circumstances.

*Cranmer*, 697 F.2d at 1318-19.  However, after listing the *Flygare* factors, the Tenth Circuit recognized a "more narrow focus" post-BAPCPA in relation to "ability to pay."  The appellate court stated:

> Since *Flygare* was decided, however, the Bankruptcy Code was amended to include 11 U.S.C. § 1325(b). . . .  Section 1325(b)'s "'ability to pay' criteria subsumes most of the *Estus* factors" and, therefore, the good faith inquiry now "has a more narrow focus." . . .  A bankruptcy court must consider "factors such as whether the debtor has stated his debts and expenses accurately; whether he has made any fraudulent misrepresentation to mislead the bankruptcy court; or whether he has unfairly manipulated the Bankruptcy Code."

*Cranmer*, 697 F.3d at 1319 n.5 (internal citations omitted).

The Chapter 7 Trustee seems to suggest that the Court should consider the seven *Gier* factors, the eleven *Flygare* factors, and the three *Cranmer* factors to decide the Motion to Convert.  That is a lot of factors.  Several Colorado bankruptcy decisions have analyzed all the various factors; but they did so in cases in which disputed Chapter 13 plans also were pending.  For example, in *McDonald*, the court was faced with both a *Marrama* conversion challenge and an argument that "the Debtors did not file their Second Amended [Chapter 13] Plan in good faith as required under § 1325(a)(3)."  508 B.R. at 206.  Under the heading "The Debtors did not file their Conversion Motion in Good Faith," the *McDonald* court analyzed only the seven *Gier* factors implicated by Sections 706(a)-(d) and 1307(c).  But in another part of the opinion captioned "The Debtors did not file their Second Amended Plan in good faith," the court separately evaluated the *Flygare* and *Cranmer* factors per Section 1325(a)(3).  In *Norwood,* the court followed the same approach applying the *Gier* factors to a *Marrama* conversion challenge under Sections 706(a)-(d) and 1307(c) and separately considering the *Flygare* and *Cranmer* factors per Section 1325(a)(3) in relation to the pending Chapter 13 plan.  *Norwood,* 2013 WL 4099834, at *11-17.

In this case, the Debtors have not yet filed a Chapter 13 plan.  Instead, they have only sought to convert their case from Chapter 7 to Chapter 13 after which, if successful, they will be required to file a Chapter 13 plan.  Under these circumstances, the Court concludes that it need not consider and analyze all the *Flygare* and *Cranmer* factors in addition to the directly applicable *Gier* factors.  The Court reasons as follows.  *First*, since the Debtors have not yet filed a Chapter 13 plan, the Court cannot effectively evaluate any unfiled potential Chapter 13 plan for confirmation under Section 1325(a) at this stage.  It would be entirely premature.  *Second*, conducting a speculative confirmation analysis under Section 1325(a) is not particularly relevant or useful.  That is because in *Marrama,* the Supreme Court determined that a motion to convert from Chapter 7 to Chapter 13 could be denied if the case would be subject to immediate dismissal or reconversion under Section 1307(c) "for cause" including "bad faith."  *Marrama,* 549 U.S. at 372-5.  But, the Supreme Court did not suggest that the bankruptcy court should conduct a mini-confirmation hearing or analysis under Section 1325(a).  Quite to the contrary, the Supreme Court distinguished conversion and confirmation issues:

> It suffices to emphasize that the debtor's conduct must, in fact, be atypical.  Limiting dismissal or denial of conversion to extraordinary cases is particularly appropriate in light of the fact that good faith in proposing a Chapter 13 plan is an express statutory ground for denying plan confirmation.  11 U.S.C. § 1325(a)(3); *see In re Love*, 957 F.2d at 1356 ("Because dismissal is harsh . . . the bankruptcy court should be more reluctant to dismiss a petition [under Section

16

> 1307(c)] . . . for lack of good faith than to reject a plan for
> lack of good faith under Section 1325(a)").

*Marrama*, 549 U.S. at 375 n.11.  *See also McDonald*, 508 B.R. at 205 ("The Supreme
Court embraced the . . . distinction between the standards for good faith in proposing a
Chapter 13 plan under § 1325(a)(3) and for dismissing or converting a case under §
1307(c), which has a more stringent standard for lack of good faith . . . .").  *Third,*
adopting the seven *Gier* factors, the eleven *Flygare* factors, and the three *Cranmer*
factors for every *Marrama* conversion challenge would be entirely untenable.  Twenty-
one is way too many factors and would lead the Court into an unnecessary factor
swamp.  So, the Court sticks with the already fairly complex totality of the circumstances
standard utilizing only the seven *Gier* factors.  At the same time, the Court is mindful of
the Supreme Court's admonition that denial of conversion is appropriate only in
"extraordinary cases."

### 3.   The Chapter 7 Trustee Did Not Meet His Burden of Showing that the Debtors Filed the Motion to Convert in Bad Faith.

#### a.   The *Gier* Factors Yield Mixed Results.

As set forth above, in assessing whether the totality of the circumstances proves
bad faith, the Court considers the seven *Gier* factors.  986 F.2d at 1329.

The first *Gier* factor is "the nature of the debt, including the question of whether
the debt would be nondischargeable in a Chapter 7 proceeding."  No creditor has
objected to the Motion to Convert.  So, no specific debt is at issue.  However, the overall
creditor make-up can be derived from the Debtors' Schedule D and E/F as well as the
Claims Register.  In terms of secured claims, the Debtors' largest debt is $306,076.00
owed to their mortgage lender on the Property, which is the Debtors' principal
residence.[34]  The Property is worth $475,000.00; so, the Debtors have substantial
equity in the Property.  The Debtors also owe money (about $23,746.00) on three loans
secured by vehicles.  With respect to unsecured debt, the Debtors listed 37 creditors
owed about $238,786.75 on their Schedule E/F.  According to the Claims Register, 22
creditors filed claims totaling $181,325.06.00.  The largest general unsecured claim is
$142,544.71 for student loans.  Student loan debt is generally non-dischargeable in
both Chapter 7 and Chapter 13.  11 U.S.C. §§ 523(a)(8), 727(b) and 1328(c).  The
Debtors already have obtained their discharge and there is no pending action to
determine the dischargeability of any specific debt.  As the Chapter 7 Trustee
acknowledges, the Debtors' receipt of a discharge in Chapter 7 is not a *per se* bar to
conversion to Chapter 13.  *Young*, 237 F.3d at 1173.  Having considered the foregoing
facts about the Debtors' debt, nothing about the debt picture or dischargeability
suggests that the Debtors have engaged in bad faith.

---

[34]      Stip. Fact No. 5.

The second *Gier* factor is "the timing of the petition." In this dispute, the timing issue focuses on the timing of the Motion to Convert. The Debtors filed for protection under Chapter 7 on September 4, 2020. But, then they waited almost a year (until July 20, 2021) to file the Motion to Convert. And, the Motion to Convert was filed in response to the Chapter 7 Trustee's efforts to potentially sell the Property. This timing suggests possible bad faith. *Norwood*, 2013 WL 4099834, at *13 ("Debtor filed his Conversion Motion on the eve of hearings to resolve . . . a motion made by the Trustee to sell Debtor's Hawaii Property. The timing strongly indicates that the Conversion Motion was filed in bad faith.").

The third *Gier* factor is "how the debt arose." As noted previously, since no creditor has objected to the Motion to Convert, no specific debt is at issue. And the general make-up of the debt is typical: a home loan; car loans; student loans; medical bills; utility bills; and amounts owed on credit cards. This factor does not point to bad faith.

The fourth *Gier* factor is "the debtor's motives in filing the petition." In the context of potential conversion, the inquiry focuses on the Debtors' motives in filing the Motion to Convert. And there is no doubt about the reason. As set forth in Stipulated Fact No. 11, "[t]he Debtors moved to convert the case in order to save the Property," which is their family residence. The Chapter 7 Trustee suggests such motive is bad faith. The Court concludes otherwise. Many consumer bankruptcy cases are filed under Chapter 13 to save homes. It happens every day. Indeed, as the Supreme Court started, Chapter 13 "affords individuals receiving regular income an opportunity to obtain some relief from their debts while retaining their property." *Bullard*, 575 U.S. at 498. Retaining or "sav[ing]" property is the entire design. So, trying to secure relief under Chapter 13 "to save the Property" is not at all indicative of bad faith. *See In re Lane*, 2011 WL 3205782, at *3 (Bankr. D. Colo. July 26, 2011) (noting "the only reason for the proposed conversion of their case to Chapter [13] is to shield [real property] from liquidation" but deciding "the motivation to prevent the liquidation of certain assets [real property] is not evidence of bad faith.").

The fifth *Gier* factor is "how the debtor's action's affected creditors." The sixth *Gier* factor is similar: "the debtor's treatment of creditors both before and after the petition was filed." There is no evidence that the Debtors mistreated creditors either before or after they filed for bankruptcy protection. They are not serial bankruptcy filers.[35] However, it is possible that creditors may be adversely affected by conversion to Chapter 13. The Debtors and the Chapter 7 Trustee have stipulated that the Property is worth $475,000.00. If the Chapter 7 Trustee were able to sell the Property in the Chapter 7 case, the estate would net approximately $48,500.00 (after the payment of real estate commissions, closing costs, liens, and the Debtors' homestead

---

[35]     The Chapter 7 Trustee points out that the Debtors filed for bankruptcy protection 21 years ago and again 15 years ago. Stip. Fact No. 2. However, those cases are so remote in time from the current case as to be irrelevant. The Debtors cannot be considered to be serial bankruptcy filers which might subject them to higher scrutiny. *See, e.g.,* 11 U.S.C. §§ 362(c)(3) and (c)(4) (establishing special automatic stay rules for debtors with other bankruptcy cases "pending with the preceding 1-year period").

exemption).[36]  So, after further reductions for administrative expenses and Chapter 7 Trustee fees, the Chapter 7 Trustee likely would be able to make a meaningful and fairly prompt distribution to general unsecured creditors.  But, in Chapter 13, the Debtors propose to make payments of $450.00 per month to the Chapter 13 Trustee for a period of 60 months.[37]  (Presumably, the Debtors will also propose to make their monthly mortgage and car payments too.)  Part of the Chapter 13 bargain is the "best interests of creditors test" which requires that "the value . . . . of property to be distributed under the plan . . . [on] each allowed unsecured claim is not less than the amount that would be paid . . . under chapter 7 . . . ."  11 U.S.C. § 1325(a)(4).  Chapter 13 payments of $450.00 per month to the Chapter 13 trustee might not be enough to meet the test but that remains to be seen.[38]  And, even if the Debtors achieve confirmation of a Chapter 13 plan, it seems likely that distributions to unsecured creditors would be delayed in comparison to payments under Chapter 7.  So, this factor cuts in favor of a bad faith determination.

The final and seventh *Gier* factor *is* "whether the debtor has been forthcoming with the bankruptcy court and the creditors."  They have.  There is no evidence that the Debtors concealed assets or lied on their Statement of Financial Affairs or Schedules.  During closing arguments, counsel for the Chapter 7 Trustee conceded the point.  The lack of any malfeasance suggests that the Debtors are not proceeding in bad faith.

To summarize, only two of the *Gier* factors suggest that the Debtors may have engaged in bad faith by virtue of filing the Motion to Convert.  All the other *Gier* factors are either neutral or point the other way.  Thus, the Chapter 7 Trustee failed to meet his burden to prove, under a totality of the circumstances standard, that the Motion to Convert was filed by the Debtors in bad faith.

**b.    The Chapter 7 Trustee Did Not Establish that the Debtors' Conduct is Atypical and that their Case is Extraordinary.**

As an additional overlay to the Court's conversion analysis, the Court recognizes that the Supreme Court has narrowly circumscribed the circumstances in which a motion to convert from Chapter 13 to Chapter 7 may be denied for alleged bad faith.  In *Marrama*, the Supreme Court stated:  "It suffices to emphasize that the debtor's conduct must, in fact, be atypical.  Limiting . . . denial of conversion to extraordinary cases is particularly appropriate . . . ."  *Marrama*, 549 U.S. at 375 n.11.

The Debtors' conduct in this case does not rise to the level of misconduct that took place in *Marrama*.  In *Marrama*, the debtor "made a number of statements about his principal asset, a house in Maine, that were misleading of inaccurate."  *Marrama*, 549 U.S. at 368.  The Debtors in this case did no such thing.  From the beginning, they fully disclosed their ownership of the Property and listed a high value for it

---

[36]    Stip. Fact No. 18.
[37]    Stip. Fact No. 17.
[38]    As explained previously, the Court concludes that it need not make definitive Chapter 13 confirmation conclusions at this stage since no Chapter 13 plan has even been filed.

($400,000.00).  The value of the Property appears to have increased since the bankruptcy filing by an additional $75,000.00.  In *Marrama*, the debtor concealed that he transferred his house to a "newly created trust for no consideration" in order to "protect the property from his creditors."  *Id*.  Nothing of the sort happened in this case.  The Debtors were not engaged in a brazen scheme to hide the Property from their creditors.  In *Marrama*, the debtor wrongfully claimed a homestead exemption in rental property and also lied about an anticipated tax refund.  Again, no similar circumstances are present in this case.

In the end, this is not an "extraordinary case[]" justifying denial of conversion from Chapter 7 to Chapter 13 under the *Marrama* framework.  *See Lane*, 2011 WL 3205782 (debtors permitted to convert from Chapter 7 to Chapter 13 to attempt to save real property).  There is no evidence of "fraudulent conduct by the atypical litigant." *Marrama*, 549 U.S. at 374.  Instead, the Debtors appear to be "honest but unfortunate." And, the circumstances of this case are quite typical.  The Debtors are merely trying to save their home by converting to Chapter 13 and engaging in the hard bargain of paying their creditors over three to five years through a Chapter 13 plan.  They have every right to try to obtain such relief in Chapter 13 although, ultimately, they will need to meet all the confirmation requirements under Section 1325(a).  Maybe the Debtors will succeed. Or, maybe not.  But the Debtors have the right to try Chapter 13.  Their efforts are not an abuse of the provisions, purpose, or spirit of Chapter 7, Chapter 13, or the Bankruptcy Code.  Rather, the Debtors are endeavoring to avail themselves of the benefits of Chapter 13 which Congress afforded to honest but unfortunate debtors. Their conduct is not bad faith.

## VI.   <u>Conclusion</u>.

For the reasons set forth above, the Court GRANTS the Motion to Convert.  It is further ORDERED:

1.   The Debtors shall file a proposed Chapter 13 Plan and a Certificate of Service evidencing compliance with L.B.R. 3015-1(b)(3) and (4), as applicable, on or before **January 3, 2022**.

2.   The Chapter 7 Trustee, within 30 days of the date of this Order, shall file and transmit to the United States Trustee:

   a.   an account of all receipts and disbursements made in the Chapter 7 case, and

   b.   a report on the administration of the case pursuant to 11 U.S.C. § 704(a)(9).

3.   The Chapter 7 Trustee forthwith shall turnover to the Debtors all records and property of the estate remaining in the Trustee's custody and control.

4.      The Chapter 7 Trustee or any other party entitled to compensation may file an Application for Compensation and Reimbursement of Expenses within 30 days of the date of this Order.

5.      The Debtors, within 14 days from the date of this Order, shall file the Statements and Schedules required by Fed. R. Bankr. P. 1007(b), if such documents have not already been filed.

DATED this 15th day of December, 2021.

BY THE COURT:

Thomas B. McNamara,
United States Bankruptcy Judge